**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SHIRLEY REE SMITH,
           *Petitioner-Appellant,*

v.

GWENDOLYN MITCHELL, Warden,
           *Respondent-Appellee.*

No. 04-55831

D.C. No.
CV-01-04484-ABC

OPINION

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, District Judge, Presiding

Argued and Submitted
February 8, 2005—Pasadena, California

Filed February 9, 2006

Before: Harry Pregerson and William C. Canby, Jr.,
Circuit Judges, and Edward C. Reed, Jr.,* District Judge.

Opinion by Judge Canby

---

*The Honorable Edward C. Reed, Jr., Senior United States District Judge for the District of Nevada, sitting by designation.

## COUNSEL

Michael J. Brennan, Manhattan Beach, California, for the petitioner-appellant.

Richard T. Breen, Deputy Attorney General, Los Angeles, California, for the respondent-appellee.

## OPINION

CANBY, Circuit Judge:

Shirley Ree Smith appeals the district court's denial of her habeas corpus petition. The State of California convicted Smith of assault on a child resulting in death. The state courts affirmed her conviction. Smith then filed this federal habeas petition claiming that her conviction violated due process

because the evidence was constitutionally insufficient. On appeal, Smith focuses her argument almost exclusively on the absence of constitutionally sufficient evidence of one element of the crime—the cause of the child's death. We agree with Smith that no rational trier of fact could have found beyond a reasonable doubt that Smith caused the child's death. We further conclude that the state court's affirmance of Smith's conviction constituted an unreasonable application of *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which established the standard for constitutional sufficiency of the evidence. *See* 28 U.S.C. § 2254(d)(1). We accordingly reverse and remand with instructions to grant the writ.

# I

Smith is the grandmother of the deceased infant, Etzel. Smith's daughter Tomeka Smith is the mother of the child. Tomeka also had two older children, Yondale and Yolanda. Prior to Etzel's birth, the entire family lived in Illinois. In July 1996, Smith moved to California and brought her two grandchildren, Yondale and Yolanda, with her. On October 8, 1996, Tomeka moved to California, where she joined Smith, Yondale, and Yolanda. Two days later, Tomeka gave birth to Etzel.

Tomeka delivered him two weeks early, and he weighed five pounds, four ounces. He was born with jaundice and a slight heart murmur. The murmur disappeared, however, three days after it was diagnosed. The jaundice gradually disappeared, too. Etzel became a healthy baby and showed no signs of child abuse.

Smith, Tomeka, Yondale, Yolanda and Etzel usually stayed with Stephen Keys, Smith's brother. Occasionally, however, they stayed with Renee Townsend, Smith's sister, at Townsend's apartment. Townsend's two children, Marcus and Marcellus lived there as well. When Tomeka and her children stayed at Townsend's apartment, Smith would accompany

them to assist Tomeka in taking care of the children. Smith was described as always giving loving care to her grandchildren, and no one had ever seen her act harshly or abusively toward them.

On the night of Etzel's death, the group stayed at Townsend's. Tomeka testified at length about the events of that evening, from her own observations and from what Smith told her as the emergency unfolded and thereafter.[1] The facts as Tomeka related them were not complicated. Etzel, who was approximately seven weeks old at the time, appeared perfectly healthy during the day and at the beginning of the evening. Both Tomeka and Smith fed him.

That night, Tomeka fed, changed, and washed Etzel before rocking him to sleep and laying him on the couch in the living room, placing him on his stomach, with his face to the side. Yondale also slept on the couch. Yolanda slept on the love seat.[2] Marcus and Marcellus slept in their bedroom.[3] Smith slept on the floor, next to the love seat on which Yolanda slept.

Townsend left the apartment at roughly the same time that Tomeka placed Etzel on the couch. Tomeka remained in the living room for another hour or so. During this time, she checked Etzel's diaper while he slept, and she saw that he moved his body at that time. She also moved Etzel back on the couch pillow because his feet started to fall off of it. She then went into Townsend's room to listen to music.

Though Tomeka usually slept in the living room with

---

[1]Smith herself testified very briefly, denying that she had shaken Etzel on the night of his death. She was subjected to almost no cross-examination, and her entire testimony extends for less than three pages of transcript.

[2]Yondale was approximately fourteen-months old, and Yolanda was approximately four-years old.

[3]They were seven- and ten-years old, respectively.

Smith and the children, that night she fell asleep in Townsend's room while listening to music. She left the door to Townsend's room open, at least partially. Tomeka testified that she fell asleep around midnight. She also stated that it was the first night that she slept in a different room from Etzel. At approximately 1:30 a.m., Smith awoke and found Etzel on the floor. She picked him up, rocked him back to sleep, and placed him on the couch in the same position (stomach down, head to the side). She did not notice anything unusual about him.

At 3:20 a.m., Smith awoke again because she had to go to the bathroom. After she returned from the bathroom, she looked at Etzel and saw that he had thrown up and had blood on his right nostril. He did not respond to her touch. She picked him up and his head "flopped back." She moved him back and forth, but he did not respond.[4] She then went into Townsend's room carrying Etzel. She woke Tomeka and told her what had happened. Tomeka dialed 911. Over the phone, Tomeka and Smith were instructed to give Etzel CPR, which they did.

When firefighters and paramedics arrived, Smith was "apprehensive" and stated that she thought Etzel had fallen off the couch. Etzel was clothed and warm, but he was not breathing and had no heartbeat. The paramedics began CPR. Three of the rescue squad noticed blood in one of Etzel's nostrils, and one consequently thought Etzel had suffered an injury. When an ambulance arrived, two more technicians administered CPR on the way to the hospital. Etzel appeared "chalky." They arrived at the hospital at 3:50 a.m. Etzel was

---

[4]Smith demonstrated this "jostle" to a social worker, who testified at trial. The social worker stated that Smith demonstrated picking up the baby under his arms and moving him quickly forward and back in a smooth motion. Smith later told police that she had given him a little shake, but then she corrected herself, saying she had "twisted" him slowly from side to side.

in full cardiac arrest. The attending physician pronounced him dead and suspected he died of Sudden Infant Death Syndrome ("SIDS"), a death with no known cause.

It was the theory of the prosecution, however, that this recitation of facts left out one crucial occurrence: Smith must have shaken Etzel so violently that it caused his death. The evidence offered in support of this theory was the autopsy and the controverted expert testimony, based on that autopsy, that Etzel died of Shaken Baby Syndrome.[5] The physical evidence, however, was not typical of that usually associated with Shaken Baby Syndrome.

Associate Deputy Medical Examiner Dr. Stephanie Erlich performed the autopsy on Etzel.[6] She testified, as did her supervisor, Dr. Eugene Carpenter, who participated in parts of the autopsy.[7] They found recent subdural and subarachnoid hemorrhages (i.e., bleeding on the brain). There was also evidence of old subdural bleeding, and both old and new bleeding around the optic nerves. There was in addition a recent small abrasion, approximately 1/16 by 3/16 of an inch, on the lower skull, upper neck region, and a recent bruise beneath this abrasion. Etzel's heart was normal.

All of the expert testimony offered by both sides agreed that the amount of recent bleeding (approximately one or two tablespoons) was not sufficient to have caused death, nor was the small abrasion sufficient for that purpose. To the prosecution experts, however, the presence of blood supported the

---

[5]Shaken Baby Syndrome is also known as Shaken Infant Syndrome or SIS. We use the Shaken Baby terminology to avoid confusion with Sudden Infant Death Syndrome or SIDS.

[6]This was Dr. Erlich's first autopsy in a child abuse case. She was assigned the autopsy because Etzel was originally believed to be the victim of Sudden Infant Death Syndrome.

[7]Dr. Carpenter was a Medical Examiner and forensic pathologist for the Los Angeles County Coroner. He had performed 3,000 to 4,000 autopsies.

diagnosis of Shaken Baby Syndrome.[8] There was no dispute, however, that the usual Shaken Baby Syndrome death occurs from massive bleeding or swelling of brain tissue that creates such crushing pressure against the brain stem that vital processes are interrupted and the baby dies. It was also agreed that in 80% or more of the cases of Shaken Baby Syndrome, there is bleeding in the retinas of the eyes. There are also frequently fractures in the arms or similar evidences of violence.

There was no swelling, and only a small, non-fatal amount of bleeding, in Etzel's case. Etzel had no retinal bleeding, and no fractures or large bodily bruises common in cases of shaking. The scalp abrasion was minimal, and was not even discovered until well into the autopsy.

The prosecution experts testified, however, that shaking caused the death even though the physical examination of the brain during and after autopsy could not demonstrate that fact. The experts testified that the shaking must have been so violent and severe that it directly tore or sheared parts of the brain stem, causing immediate cessation of vital activity such as breathing. This tear in the brain stem would not have been apparent in autopsy, according to the prosecution experts, because instantaneous death would have prevented any bleeding or swelling. No microscopic examination of the brainstem was performed following the autopsy because, as Dr. Erlich testified, "[W]e wouldn't have seen anything anyway." The fatal tear or shearing would not have been detectable. Dr. Ehrlich could not identify any source in the literature for her hypothesis of undetectable brain stem shearing, but said she had learned it from lectures and consultations.

With regard to this undetectable cause of death, defense

---

[8]In addition to Drs. Ehrlich and Carpenter, Dr. David Chadwick, a pediatrician specializing in abuse, also testified for the prosecution. His testimony was briefer than, but generally paralleled, that of Drs. Ehrlich and Carpenter.

expert Dr. Richard Siegler, said that the hypothesis was "fantasy." When pressed by the prosecutor to elaborate, he said: "[W]hat you have said is possible, but it is also not possible and that's what we call fantasy. . . . There is no way to confirm it or deny it." Dr. Siegler stated that he had not previously heard or read of the hypothesis of undetectable brain stem injury in a Shaken Baby death.[9] Dr. Seigler opined that Etzel died from the lingering effects of earlier brain trauma of unknown but quite possibly innocent cause, and that his death was inconsistent with Shaken Baby Syndrome.

The defense also presented Dr. William Goldie, who examined the records and testified that Etzel likely died of SIDS. Dr. Goldie, like Dr. Siegler, did not believe that Shaken Baby Syndrome could occur without massive brain swelling or bleeding, at least not when the brain stem appeared undamaged, as Etzel's did. He noted that prematurely born infants sometimes bleed into the head without cause. Dr. Goldie testified that SIDS was the leading cause of deaths in infants from one to five months of age, while Shaken Baby Syndrome deaths occur predominantly in ages four to nine months.

Dr. Goldie described some of the characteristics that led him to conclude that Etzel died of Sudden Infant Death Syndrome. With SIDS, the infant usually would appear normal, but then he or she suddenly would die. SIDS occurred more frequently in babies who, like Etzel, were small for their age, who had mothers who had multiple children already or smoked or used drugs, and, most importantly, who had been placed face-down on their stomachs. Males were more likely victims than females. He also concluded that Etzel's problems —jaundice, heart murmur, and low birth weight—made him more likely to die from SIDS, as did a background of poverty.

---

[9]Dr. Siegler was a pathologist of many years experience associated with the University of Southern California, and formerly with Harvard and U.C.L.A. He had done 5,000 to 8,000 autopsies, about 50 of which were infants.

## II

On this evidence, a jury of the Superior Court of Los Angeles County convicted Smith of assault on a child causing death, in violation of section 273ab of the California Penal Code.[10] The trial judge sentenced her to fifteen years to life in prison. Smith appealed, challenging the sufficiency of the evidence. The California Court of Appeal affirmed in an unpublished opinion, and the Supreme Court of California denied review.

Smith filed a petition for habeas corpus in the Central District of California. A magistrate judge recommended dismissal, and the district court dismissed the petition. The court, however, granted a certificate of appealability on the question "[w]hether there was sufficient evidence to convict [Smith] of committing assault on a child in her care or custody causing death."

## III

We review de novo the district court's denial of a habeas petition. *See Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003). We approach this case with a firm awareness of the very strict limits that the Antiterrorism and Effective Death Penalty Act ("AEDPA") places on our collateral review of state criminal convictions. *See Juan H. v. Allen*, 408 F.3d 1262, 1269-70 (9th Cir. 2005), *cert. denied*, 2006 WL 88993, 88994 (U.S. Jan. 17, 2006). We cannot grant relief unless the decision of the California Court of Appeal was "contrary to,

---

[10]Section 273ab provides the following:

Any person who, having the care or custody of a child who is under eight years of age, assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment in the state prison for [fifteen] years to life.

Cal. Penal Code § 273ab.

or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The constitutional standard for sufficiency of the evidence established by the Supreme Court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319. Our task under AEDPA, then, is to determine whether the decision of the California Court of Appeal, holding that the evidence was sufficient to convict Smith, was an unreasonable application of *Jackson*. *See* 28 U.S.C. § 2254(d); *see also Juan H. v. Allen*, 408 F.3d at 1274-75 & nn. 12-13 (establishing that AEDPA requires a layer of deference to a state court decision in addition to that specified by *Jackson*). In this most unusual case, we conclude that the Court of Appeal unreasonably applied *Jackson*.

## IV

**[1]** The troubling state of the evidence in this case was perhaps best described by Magistrate Judge Patrick J. Walsh. Even though, contrary to our view, he believed the strict requirements of AEDPA for habeas relief had not been met, Judge Walsh stated:

> This is not the typical shaken baby case. Grandmothers, especially those not serving as the primary caretakers, are not the typical perpetrators. Further, Petitioner was helping her daughter raise her other children (a 2-year-old and a 14-month-old) and there was no hint of Petitioner abusing or neglecting these other children, who were in the room with Etzel when he died. Still further, there was no evidence of any precipitating event that might have caused Petitioner to snap and assault her grandson. She was not

trapped in a hopeless situation with a child she did not want or love. Nor was she forced to single-handedly care for a baby that had been crying all day and all night. In fact, there is no evidence that Etzel was doing anything other than sleeping the night that he died. The medical evidence was not typical either, in that some of the telltale signs usually found in shaken baby cases did not exist in this case.

Nothing significant in the background suggests guilt, therefore, and many factors suggest innocence.[11] Indeed, not only was there no evidence of any "precipitating event that might have caused [Smith] to snap," but it is extremely unlikely that even a very troublesome act by seven-week-old Etzel would cause Smith to shake Etzel to death when his mother lay but a few feet away and easily available. A constitutionally permissible finding of guilt in this case therefore depends on the expert evidence of the cause of death.

   **[2]** There is no question that the prosecution experts testified that a shaking had caused the death, but they conceded the absence of the usual indicators of violent shaking such as bruises on the body, fractured arms or ribs, or retinal bleeding. There was bleeding on the brain, both old and new, but not enough to cause death. All of the prosecution witnesses based their opinion of Shaken Baby Syndrome on their hypothesis that violent shaking had torn or sheared the brain stem in an undetectable way. Their testimony was not that the brain demonstrated death in the usual manner of Shaken Baby Syndrome, caused by excessive bleeding or swelling that crushes the brain stem. Instead, their testimony was that death was caused by shearing or tearing of the brain stem and they

---

[11]A social worker, who visited Smith and Tomeka and expressed the view that Etzel had died of shaking, testified that Smith said "Oh, my God. Did I do it?" A rational trier of fact, however, could not convict on this distraught and equivocal statement in the absence of credible expert testimony as to the cause of death.

reached this conclusion because *there was no evidence in the brain itself of the cause of death*. Thus, as the defense expert Dr. Siegler stated, the tearing might have occurred or it might not have occurred; there simply was no evidence to permit an expert conclusion one way or the other on the point. This is simply not the stuff from which guilt beyond a reasonable doubt can be established, especially in the face of all the other circumstances, many of which were recited by the magistrate judge, making the crime unlikely. An expert's testimony as to a theoretical conclusion or inference does not rescue a case that suffers from an underlying insufficiency of evidence to convict beyond a reasonable doubt. *See United States v. Boissoneault*, 926 F.2d 230, 234 (2d Cir. 1991).

## V

[3] The prosecution's expert testimony, absolutely critical to its case, concluded that the cause of death was tearing or shearing of the brain stem when there was no physical evidence of such tearing or shearing, and no other evidence supporting death by violent shaking. Absence of evidence cannot constitute proof beyond a reasonable doubt.

[4] The California Court of Appeal, in affirming Smith's conviction, described the expert testimony but did not address the problem presented by the lack of evidence, from the autopsy or ensuing tests, that the brain stem had been sheared. It affirmed with a statement that the experts conflicted and resolution of the conflict was for the jury. With all due respect to the California Court of Appeal, and even with the additional layer of deference mandated by AEDPA, we conclude that the Court of Appeal unreasonably applied *Jackson* when it held the evidence to be sufficient to convict Smith of causing Etzel's death. There was simply no demonstrable support for shaking as the cause of death. As a result of the unreasonable application of *Jackson*, there has very likely been a miscarriage of justice in this case.

We reverse the judgment of the district court and remand with instructions to grant the writ.

**REVERSED**; **REMANDED** with instructions.