Justice Ginsburg,
with whom Justice Breyer and Justice Sotomayor join,
dissenting.
The Court’s summary disposition of this case, in my judgment, is a misuse of discretion. I set out below my reasons for concluding that discretion, soundly exercised, would have occasioned denial of California’s petition for review.
The Magistrate Judge who reviewed respondent Shirley Ree Smith’s habeas corpus petition in the first instance con- *10 eluded, as the Court does today, that relief was unwarranted. He observed, however, that the evidence, “though clearly sufficient to support a conviction, raises many questions”:
“Grandmothers, especially those not serving as the primary caretakers, are not the typical perpetrators [in shaken baby cases]. Further, [Smith] was helping her daughter raise her other children (a [4-year-old] and a 14-month-old) and there was no hint of [Smith] abusing or neglecting these other children, who were in the room with Etzel when he died. Still further, there was no evidence of any precipitating event that might have caused [Smith] to snap and assault her grandson. She was not trapped in a hopeless situation with a child she did not want or love. Nor was she forced to single-handedly care for a baby that had been crying all day and all night. In fact, there is no evidence that Etzel was doing anything other than sleeping the night he died. In addition, [Smith’s] daughter [Tomeka], Etzel’s mother, was in the room next door when Etzel died. The medical evidence was not typical either, in that some of the telltale signs usually found in shaken baby cases did not exist in this case.” Smith v. Mitchell, Case No. CV 01-4484-ABC (CD Cal., Mar. 22, 2004), p. 10, App. I to Pet. for Cert. 65.
The District Court adopted the Magistrate Judge’s recommendation to deny Smith’s petition, but granted a certificate of appealability, recognizing that “reasonable jurists would find the [court’s] assessment of [Smith’s] claims debatable.” Order in No. CV 01-4484-ABC (CD Cal., Apr. 29, 2004), Doc. 36, p. 1.
After full briefing and argument, the Ninth Circuit reversed the District Court’s judgment. The Court of Appeals acknowledged the limitations on its authority. “We approach this ease,” the court said, “with a firm awareness of the very strict limits that the [Antiterrorism and Effective *11 Death Penalty Act of 1996 (AEDPA)] places on our collateral review of state criminal convictions.” Smith v. Mitchell, 437 F. 3d 884, 888-889 (CA9 2006). Accurately describing the standards applicable under AEDPA and Jackson v. Virginia, 443 U. S. 307 (1979), and reviewing the evidence in some detail, the court concluded that “[i]n this most unusual case, . . . the [California] Court of Appeal unreasonably applied Jackson.” 437 F. 3d, at 889.
Beyond question, the Court today reviews a case as tragic as it is extraordinary and fact intensive. By taking up the case, one may ask, what does the Court achieve other than to prolong Smith’s suffering and her separation from her family. Is this Court’s intervention really necessary? Our routine practice counsels no.
Error correction is “outside the mainstream of the Court’s functions.” E. Gressman, K. Geller, S. Shapiro, T. Bishop, & E. Hartnett, Supreme Court Practice § 5.12(c)(3), p. 351 (9th ed. 2007). As this Court’s Rule 10 informs, “[a] petition for a writ of certiorari is rarely granted when the asserted error [is] . . . the misapplication of a properly stated rule of law.” The Ninth Circuit correctly described the relevant legal rules under AEDPA and Jackson v. Virginia. This Court, therefore, has no law-clarifying role to play. Its summary adjudication seems to me all the more untoward for these reasons: What is now known about shaken baby syndrome (SBS) casts grave doubt on the charge leveled against Smith; and uncontradicted evidence shows that she poses no danger whatever to her family or anyone else in society.
I turn first to the medical evidence presented at trial. Dr. Carpenter, the autopsy supervisor, testified that the following symptoms are consistent with, but not required for, a diagnosis of SBS: cerebral edema, subdural hemorrhage, retinal hemorrhage, bleeding at the joints of the back of the neck, bruises on the arms, fractures of the ribs, and internal injuries to the buttocks, abdominal organs, and chest organs. Tr. 575. Few of these signs of SBS were present here. Et- *12 zel’s subdural hemorrhage and subarachnoid hemorrhage were “minimal,” insufficient to cause death. Id., at 540-541, 557-558, 675, 693, 700, 729, 1484-1485. There was no brain swelling and no retinal hemorrhage in either eye. Id., at 580, 693, 802, 1274.[1] Similarly absent were any fractures, sprains, bleeding in the joints, or displacement of joints. Id., at 682. A “tiny” abrasion on the skin and a corresponding bruise under the scalp did not produce brain trauma. Id., at 555, 562, 576, 712-713.
These findings led Dr. Carpenter, the autopsy supervisor, and Dr. Erlich, who performed Etzel’s autopsy, to rule out two commonly proffered causes of death in SBS cases: massive bleeding and massive swelling that create pressure and push the brain downward. Id., at 541, 551-552, 729-730, 801. Instead, they opined, Etzel’s death was caused by direct injury — shearing or tearing of the brainstem or the brain itself. Id., at 694-696, 729-730, 801, 1298. The autopsy revealed no physical evidence of such injury, either grossly or microscopically. Id., at 730, 763, 803-804, 1298-1299. Dr. Carpenter was unable to state which particular areas of the brain were injured, and the neuropathologist found no evidence of specific brain injury. Id., at 696, 1475. No doctor located any tear. Indeed, the examining physicians did not cut open Etzel’s brainstem, or submit it to neu-ropathology, because, in their own estimation, “[w]e wouldn’t have seen anything anyway.” Id., at 803, 1299.[2]
Neither doctor testified to ever having performed an autopsy on an infant in which a similar conclusion was reached. Nor did either physician point to any medical literature supporting their belief that shearing or tearing of the brainstem *13 or the brain itself caused Etzel’s death. Id., at 694-696, 801-802. Dr. Carpenter nevertheless maintained that when there is subdural hemorrhage without signs of external trauma to the head or skull, the injury is necessarily caused by violent shaking. Id., at 576-577, 660-661. Smith’s conviction thus turned on, as Dr. Erlich put it, “direct trauma which we don’t see to the brainstem.” Id., at 801. That this gave the Ninth Circuit pause is understandable. Dr. Erlich herself conceded that “[i]t is a difficult concept to absorb.” Id., at 1298.
Reason to suspect the Carpenter-Erlich thesis has grown in the years following Smith’s 1997 trial. Doubt has increased in the medical community “over whether infants can be fatally injured through shaking alone.” State v. Ed-munds, 2008 WI App. 33, ¶15,308 Wis. 2d 374, 385, 746 N. W. 2d 590, 596. See, e. g., Donohoe, Evidence-Based Medicine and Shaken Baby Syndrome, Part I: Literature Review, 1966-1998, 24 Am. J. Forensic Med. & Pathology 239, 241 (2003) (By the end of 1998, it had become apparent that “there was inadequate scientific evidence to come to a firm conclusion on most aspects of causation, diagnosis, treatment, or any other matters pertaining to SBS,” and that “the commonly held opinion that the finding of [subdural hemorrhage] and [retinal hemorrhage] in an infant was strong evidence of SBS was unsustainable.”); Bandak, Shaken Baby Syndrome: A Biomechanics Analysis of Injury Mechanisms, 151 Forensic Sci. Int’l 71, 78 (2005) (“Head acceleration and velocity levels commonly reported for SBS generate forces that are far too great for the infant neck to withstand without injury. . . . [A]n SBS diagnosis in an infant. . . without cervical spine or brain stem injury is questionable and other causes of the intracerebral injury must be considered.”); Minns, Shaken Baby Syndrome: Theoretical and Evidential Controversies, 35 J. Royal College of Physicians of Edinburgh 5, 10 (2005) (“[Djiagnosing ‘shaking’ as a mechanism of injury ... is not possible, because these are unwitnessed injuries that may *14 be incurred by a whole variety of mechanisms solely or in combination.”); Uscinski, Shaken Baby Syndrome: An Odyssey, 46 Neurol. Med. Chir. (Tokyo) 57, 59 (2006) (“[T]he hypothetical mechanism of manually shaking infants in such a way as to cause intracranial injury is based on a misinterpretation of an experiment done for a different purpose, and contrary to the laws of injury biomechanics as they apply specifically to the infant anatomy.”); Leestma, Case Analysis of Brain-Injured Admittedly Shaken Infants, 54 Cases, 1969-2001, 26 Am. J. Forensic Med. & Pathology 199, 211 (2005) (“[M]ost of the pathologies in allegedly shaken babies are due to impact injuries to the head and body.”); Squier, Shaken Baby Syndrome: The Quest for Evidence, 50 Developmental Med. & Child Neurol. 10, 13 (2008) (“[H]ead impacts onto carpeted floors and steps from heights in the 1 to 3 feet range result in far greater ... forces and accelerations than shaking and slamming onto either a sofa or a bed.”).
In light of current information, it is unlikely that the prosecution’s experts would today testify as adamantly as they did in 1997. Noteworthy in this regard, prosecution witnesses Carpenter and Erlich testified that the belated diagnosis of old (i <?., chronic) blood in Etzel’s brain and around his optic nerves did not change their initial cause-of-death findings, because rebleeding of old subdural blood does not occur in infants. Tr. 608-609, 672-673, 721-722, 771, 776, 1269-1270, 1283. Recent scientific opinion undermines this testimony. See Miller & Miller, Overrepresentation of Males in Traumatic Brain Injury of Infancy and in Infants with Macrocephaly, 31 Am. J. Forensic Med. & Pathology 165, 170 (2010) (“Small, asymptomatic [subdural hematomas] from the normal trauma of the birth process can spontaneously rebleed or rebleed with minimal forces, enlarge, and then present with clinical symptoms and [subdural hematoma, retinal hemorrhages, and neurologic dysfunction] in the first year of life. . . . [This situation] mimic[s] child abuse, and we believe many such infants in the past have been mistakenly *15 diagnosed as victims of child abuse, when they were likely not.”)- What is now known about SBS hypotheses seems to me worthy of considerable weight in the discretionary decision whether to take up this tragic case.
I consider next the State’s,meager nonmedical evidence. There was no evidence whatever that Smith abused her grandchildren in the past or acted with any malicious intent on the night in question. Instead, the evidence indicated that Smith was warmhearted, sensitive, and gentle. Tr. 1086. As earlier observed, see supra, at 10, the Magistrate Judge noted the absence of any motive or precipitating event that might have led Smith to shake Etzel violently. Although shaking may quiet a crying child, Tr. 601, no evidence showed that Etzel was crying in the hours before he died, id., at 444. To the contrary: Any loud crying likely would have woken Etzel’s siblings, Yondale, age 14 months, and Yolanda, age 4, asleep only feet away, even Etzel’s mother, To-meka, asleep in the neighboring room. Id., at 335, 358-361. Yet no one’s slumber was disturbed. Id., at 358-361.
The prosecution relied on the testimony of a social worker, who asserted that Smith, after hearing that the cause of Et-zel’s death had been changed from Sudden Infant Death Syndrome (SIDS) to SBS, id., at 840, and after stating that she had given Etzel “a little shake, a jostle to awaken him” when she found him unresponsive, asked “something like 'Oh, my God. Did I do it? Did I do it? Oh, my God.’ ” Id., at 842, 847.[3] Etzel’s mother, Tomeka, contradicted this account. According to Tomeka, after the social worker accused Smith of killing Etzel, Smith started crying, id., at 429-430, and responded, “No, I didn’t,” id., at 387. Taking the social worker’s version of events as true, Smith’s distraught and equivocal question fairly cannot be equated to a confession of guilt. Giving a baby “a little shake, a jostle to wake him,” *16 ante, at 3 (internal quotation marks omitted), after finding him unexpectedly unresponsive, surely is not an admission to shaking a child violently, causing his brainstem to tear.
Moreover, Smith’s counsel, Ubiwe Eriye,[4] represented her poorly at trial. In a case as trying as this one, competent counsel might have persuaded the jury to disbelieve the prosecution’s ease. A few examples from the record are illustrative. At the suppression hearing, the presiding judge was so disturbed about Eriye’s preparation for trial that he remarked to the defendant, “Miss Smith, I’m scared.” Tr. A52. Eriye badly misportrayed the burden of proof when he declared, both at the suppression hearing and in his opening remarks, that he would prove, beyond a shadow of a doubt, that Smith was not guilty. Id., at A58-A59, 213. The two experts Eriye called presented testimony that hardly meshed.[5]
In sum, this is a notably factbound case in which the Court of Appeals unquestionably stated the correct rule of law. It is thus “the type of case in which we are most inclined to deny certiorari.” Kyles v. Whitley, 514 U. S. 419, 460 (1995) (Scalia, J., dissenting). Nevertheless, the Court is bent on rebuking the Ninth Circuit for what it conceives to be defiance of our prior remands. See ante, at 9. I would not ignore Smith’s plight and choose her case as a fit opportunity to teach the Ninth Circuit a lesson.
But even if granting review qualified as a proper exercise of our discretionary authority, I would resist summary reversal of the Court of Appeals’ decision. The fact-intensive character of the case calls for attentive review of the record, *17 including a trial transcript that runs over 1,500 pages. Careful inspection of the record would be aided by the adversarial presentation that full briefing and argument afford. See, e. g., R. Fallon, J. Manning, D. Meltzer, D. Shapiro, Hart and Wechsler’s The Federal Courts and the Federal System 1480 (6th ed. 2009) (posing question whether summary reversal would “smack of unfairness to the losing party unless an opportunity were afforded for the filing of briefs on the merits”); Gressman, Supreme Court Practice § 6.12(c), p. 417, and n. 46 (questioning the Court’s reliance on its own examination of the record in summarily reversing, without at least affording the parties, “particularly the respondent,” an opportunity to brief the critical issue and identify the relevant portions of the record). Peremptory disposition, in my judgment, is all the more inappropriate given the grave consequences of upsetting the judgment below: Smith, who has already served ten years, will be returned to prison to complete a sentence of fifteen years to life. Before depriving Smith of the liberty she currently enjoys, and her family of her care, I would at least afford her a full opportunity to defend her release from a decade’s incarceration.
* * *
For the reasons stated, justice is not served by the Court’s exercise of discretion to take up this tragic, factbound case. I would therefore deny the petition for review.

 The State’s third expert, Dr. Chadwick, who was not present at Etzel’s autopsy, testified that there may have been some swelling. But he conceded that any swelling could not have caused death. Tr. 1478.

 Dr. Chadwick mentioned new methods, not then standard in medical examiners’ offices and not used here, which may reveal this type of brain-stem damage. Id., at 1448, 1481-1482.

 The social worker also testified that Etzel’s mother, Tomeka, told Smith: “If it wasn’t for you this wouldn’t have happened.” Id., at 847. Tomeka denied making any statement to that effect. Id., at 389.

 Eriye has since resigned from the California Bar with discipline charges pending.

 Dr. Goldie testified that the old blood in Etzel’s brain did not contribute to his death, and Etzel died of SIDS. Id., at 994-995,1403. In contrast, Dr. Siegler testified that the old blood provided the basis for his conclusion that Etzel died of an earlier brain trauma, id., at 1152-1153, 1166-1167, not SIDS, id., at 1193-1194.