# SUPREME COURT OF THE UNITED STATES

## JAVIER CAVAZOS, ACTING WARDEN *v.* SHIRLEY REE SMITH

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 10–1115.   Decided October 31, 2011

PER CURIAM.

The opinion of the Court in *Jackson* v. *Virginia*, 443 U. S. 307 (1979), makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable." *Renico* v. *Lett*, 559 U. S. ___, ___ (2010) (slip op., at 5) (internal quotation marks omitted).

Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold. The Court of Appeals in this case substituted its judgment for that of a California jury on the question whether the prosecution's or the defense's expert witnesses more persuasively explained the cause of a death. For this reason, certiorari is granted and the judgment of the Court of Appeals is reversed.

\*    \*    \*

This case concerns the death of 7-week-old Etzel Glass.

On November 29, 1996, Etzel's mother, Tomeka, put Etzel to sleep on a sofa before going to sleep herself in another room. Respondent Shirley Ree Smith—Tomeka's mother—slept on the floor next to Etzel. Several hours later, Smith ran into Tomeka's room, holding Etzel, who was limp, and told her that "[s]omething [was] wrong with Etzel." Tr. 416. By the time emergency officials arrived, Etzel was not breathing and had no heartbeat. Smith reported that she thought Etzel had fallen off the sofa. The officials' efforts to resuscitate Etzel failed.

Doctors initially attributed Etzel's death to sudden infant death syndrome (SIDS), the customary diagnosis when an infant shows no outward signs of trauma. But after an autopsy, the coroner concluded that the cause of death was instead shaken baby syndrome (SBS). When a social worker informed Smith of that finding, Smith told her that Etzel had not responded to her touch while sleeping, so she had picked him up and given him "a little shake, a jostle" to wake him. *Id.*, at 842. According to the social worker, Smith then said something to the effect of, "Oh, my God. Did I do it? Did I do it? Oh, my God." *Id.*, at 847 (internal quotation marks omitted). In an interview with the police a few days later, Smith said that she had shaken Etzel, but then she corrected herself and said that she had twisted him to try to elicit a reaction. Smith was arrested and charged with assault on a child resulting in death. See Cal. Penal Code Ann. §273ab (West 2008) ("Any person who, having the care or custody of a child who is under eight years of age, assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment . . .").

At trial, the jury heard seven days of expert medical testimony on the cause of Etzel's death. The prosecution offered three experts, each of whom attested that Etzel's death was the result of SBS—not SIDS, as the defense

contended. The first expert, Dr. Eugene Carpenter, was the medical examiner for the Los Angeles County Coroner who had supervised Etzel's autopsy. Dr. Carpenter is board certified in forensic, anatomic, and clinical pathology. He testified that Etzel's autopsy revealed recent hemorrhages in the brain, and he opined that the bleeding and other features of Etzel's pathology, including a bruise and abrasion on the lower back of the baby's head, were consistent with violent shaking. Dr. Carpenter identified two means by which shaking can result in a baby's death: The first is that the shaking causes blood vessels in the brain to tear, creating a pool of blood that pushes the brain downward into the spinal canal, resulting in death but little direct damage to the brain. The second is that the shaking itself is sufficiently severe that the brain directly tears in vital areas, causing death with very little bleeding. Dr. Carpenter testified that Etzel's injuries were consistent with the latter pathology. He also explained that the injuries could not be attributed to either a fall from the sofa or the administration of cardiopulmonary resuscitation. Nor, according to Dr. Carpenter, was it possible that Etzel perished from SIDS, given the signs of internal trauma. Dr. Carpenter did testify, however, that while SBS victims often suffer retinal hemorrhaging, Etzel's autopsy revealed no such injury.

The prosecution's second expert, Dr. Stephanie Erlich, was the associate deputy medical examiner who actually performed Etzel's autopsy. She is board certified in anatomic pathology and neuropathology. She corroborated Dr. Carpenter's testimony about the autopsy findings, and added that a followup neuropathological examination of Etzel's brain confirmed the existence of recent hemorrhaging. Noting only a minimal amount of new blood in Etzel's brain, she testified that the cause of death was direct trauma to the brainstem. On cross-examination, she agreed with defense counsel that retinal hemorrhaging

(absent in Etzel's case) is present in 75 to 80 percent of SBS cases.

The third prosecution expert, Dr. David Chadwick, is board certified in pediatrics and the author of articles on childhood death by abusive trauma. He testified that Etzel's injuries were consistent with SBS and that old trauma could not have been the cause of the child's death.

The defense called two experts to dispute these conclusions. The first, pathologist Dr. Richard Siegler, testified that Etzel died from brain trauma, but that it was not the result of SBS, given the lack of retinal hemorrhaging. He admitted on cross-examination, however, that an absence of retinal hemorrhaging does not exclude a finding of SBS. He also acknowledged that he did not believe the cause of Etzel's death was SIDS. According to Dr. Siegler, Etzel died from old trauma, an opinion he reached on the basis of studying photographs of the neuropathological examination.

The other defense expert, pediatric neurologist Dr. William Goldie, testified that Etzel's death *was* due to SIDS. He noted that Etzel was born with jaundice, a heart murmur, and low birth weight—making him more susceptible to SIDS. Dr. Goldie testified that pathologists had not been able to determine the cause of Etzel's death and that the bleeding could be attributed to the resuscitation efforts.

The jury found Smith guilty. Concluding that the jury "carefully weighed" the "tremendous amount of evidence" supporting the verdict, Tr. 1649, the trial judge denied Smith's motion for a new trial and sentenced her to an indeterminate term of 15 years to life in prison.

On direct review, Smith contended that the evidence was not sufficient to establish that Etzel died from SBS. After thoroughly reviewing the competing medical testimony, the California Court of Appeal rejected this claim, concluding:

"The expert opinion evidence we have summarized was conflicting. It was for the jury to resolve the conflicts. The credited evidence was substantial and sufficient to support the jury's conclusions that Etzel died from shaken baby syndrome. The conviction is supported by substantial evidence." *People* v. *Smith*, No. B118869 (Feb. 10, 2000), App. K to Pet. for Cert. 86.

The California Supreme Court denied review. App. J, *id.*, at 74.

Smith then filed this petition for a writ of habeas corpus with the United States District Court for the Central District of California, renewing her claim that the evidence was insufficient to prove that Etzel died of SBS. Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, that court had no power to afford relief unless Smith could show either that the California Court of Appeal's decision affirming the conviction "was contrary to, or involved an unreasonable application of," clearly established federal law as reflected in the holdings of this Court's cases, 28 U. S. C. §2254(d)(1), or that it "was based on an unreasonable determination of the facts" in light of the state court record, §2254(d)(2). *Harrington* v. *Richter*, 562 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 10).

The Magistrate Judge to whom the case was assigned issued a report acknowledging that "[t]his is not the typical shaken baby case" and that the evidence against Smith "raises many questions." App. I to Pet. for Cert. 65. But the Magistrate Judge nevertheless concluded that the evidence was "clearly sufficient to support a conviction." *Ibid.* The District Court adopted the Magistrate Judge's report and denied the petition. App. G, *id.*, at 52.

On appeal, the Ninth Circuit reversed with instructions to grant the writ. *Smith* v. *Mitchell*, 437 F. 3d 884 (2006). Despite the plentitude of expert testimony in the trial

record concluding that sudden shearing or tearing of the brainstem was the cause of Etzel's death, the Ninth Circuit determined that there was "no evidence to permit an expert conclusion one way or the other" on that question because there was "no physical evidence of . . . tearing or shearing, and no other evidence supporting death by violent shaking." *Id.*, at 890. The court said that the State's experts "reached [their] conclusion because *there was no evidence in the brain itself of the cause of death.*" *Ibid.* (emphasis in original). The court concluded that because "[a]bsence of evidence cannot constitute proof beyond a reasonable doubt," *ibid.*, the California Court of Appeal had "unreasonably applied" this Court's opinion in *Jackson* v. *Virginia* in upholding Smith's conviction, 437 F. 3d, at 890.

That conclusion was plainly wrong. *Jackson* says that evidence is sufficient to support a conviction so long as "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U. S., at 319. It also unambiguously instructs that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume— even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.*, at 326. When the deference to state court decisions required by §2254(d) is applied to the state court's already deferential review, see *Renico*, 559 U. S., at ___ (slip op., at 11), there can be no doubt of the Ninth Circuit's error below.

The jury was presented with competing views of how Etzel died. It was made aware of the various experts' qualifications and their familiarity with both the subject of SBS and the physical condition of Etzel's body. It observed the attorneys for each party cross-examine the experts and elicit concessions from them. The State's

experts, whom the jury was entitled to believe, opined that the physical evidence was consistent with, and best explained by, death from sudden tearing of the brainstem caused by shaking. The Ninth Circuit's assertion that these experts "reached [their] conclusion because there was no evidence in the brain itself of the cause of death" is simply false. There *was* "evidence in the brain itself." The autopsy revealed indications of recent trauma to Etzel's brain, such as subdural and subarachnoid hemorrhaging, hemorrhaging around the optic nerves, and the presence of a blood clot between the brain's hemispheres. The autopsy also revealed a bruise and abrasion on the lower back of Etzel's head. These affirmative indications of trauma formed the basis of the experts' opinion that Etzel died from shaking so severe that his brainstem tore.

Defense counsel made certain that the jury understood that the prosecution's experts were unable to identify the precise point of tearing itself. But as Judge Bea noted in his dissent from the Ninth Circuit's denial of rehearing en banc, the experts explained why the location of the tear was undetectable: "Etzel's death happened so quickly that the effects of the trauma did not have time to develop." *Smith* v. *Mitchell,* 453 F. 3d 1203, 1207 (2006). According to the prosecutions' experts, there was simply no opportunity for swelling to occur around the brainstem before Etzel died.

In light of the evidence presented at trial, the Ninth Circuit plainly erred in concluding that the jury's verdict was irrational, let alone that it was unreasonable for the California Court of Appeal to think otherwise. See §2254(d). Doubts about whether Smith is in fact guilty are understandable. But it is not the job of this Court, and was not that of the Ninth Circuit, to decide whether the State's theory was correct. The jury decided that question,

and its decision is supported by the record.*

It is said that Smith, who already has served years in prison, has been punished enough, and that she poses no danger to society. These or other considerations perhaps would be grounds to seek clemency, a prerogative granted to executive authorities to help ensure that justice is tempered by mercy. It is not clear to the Court whether this process has been invoked, or, if so, what its course has been. It is not for the Judicial Branch to determine the standards for this discretion. If the clemency power is exercised in either too generous or too stingy a way, that calls for political correctives, not judicial intervention.

The decision below cannot be allowed to stand. This Court vacated and remanded this judgment twice before, calling the panel's attention to this Court's opinions highlighting the necessity of deference to state courts in §2254(d) habeas cases. Each time the panel persisted in its course, reinstating its judgment without seriously confronting the significance of the cases called to its attention. See *Patrick* v. *Smith*, 550 U. S. 915 (vacating and remanding in light of *Carey* v. *Musladin*, 549 U. S. 70 (2006)), reinstated on remand, 508 F. 3d 1256 (2007) *(per curiam)*; 558 U. S. ___ (2010) (vacating and remanding in light of *McDaniel* v. *Brown*, 558 U. S. ___ (2010) *(per curiam)*), reinstated on remand *sub nom. Smith* v. *Mitchell*, 624 F. 3d 1235 (2010) *(per curiam).* Its refusal to do so necessitates this Court's action today.

The petition for a writ of certiorari and respondent's

––––––––––

*The dissent's review of the evidence presented to the jury over seven days is precisely the sort of reweighing of facts that is precluded by *Jackson* v. *Virginia*, 443 U. S. 307, 324 (1979), and precisely the sort of second-guessing of a state court decision applying *Jackson* that is precluded by AEDPA, §2254(d). The dissent's views on how "adamantly" experts would testify today as opposed to at the time of trial, *post*, at 6 (opinion of GINSBURG, J.), are of course pure speculation, as would be any views on how a jury would react to less adamant testimony.

Per Curiam

motion to proceed *in forma pauperis* are granted. The judgment of the Court of Appeals for the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

JAVIER CAVAZOS, ACTING WARDEN *v.* SHIRLEY
REE SMITH

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 10–1115.    Decided October 31, 2011

JUSTICE GINSBURG, with whom JUSTICE BREYER and
JUSTICE SOTOMAYOR join, dissenting.

The Court's summary disposition of this case, in my
judgment, is a misuse of discretion.  I set out below my
reasons for concluding that discretion, soundly exercised,
would have occasioned denial of California's petition for
review.

The Magistrate Judge who reviewed respondent Shirley
Ree Smith's habeas corpus petition in the first instance
concluded, as the Court does today, that relief was unwar-
ranted.  He observed, however, that the evidence, "though
clearly sufficient to support a conviction, raises many
questions":

> "Grandmothers, especially those not serving as the
> primary caretakers, are not the typical perpetrators
> [in shaken baby cases].  Further, [Smith] was helping
> her daughter raise her other children (a [4-year-old]
> and a 14-month-old) and there was no hint of [Smith]
> abusing or neglecting these other children, who were
> in the room with Etzel when he died.  Still further,
> there was no evidence of any precipitating event that
> might have caused [Smith] to snap and assault her
> grandson.  She was not trapped in a hopeless situa-
> tion with a child she did not want or love.  Nor was
> she forced to single-handedly care for a baby that had
> been crying all day and all night.  In fact, there is no
> evidence that Etzel was doing anything other than

> sleeping the night he died. In addition, [Smith's]
> daughter [Tomeka], Etzel's mother, was in the room
> next door when Etzel died. The medical evidence was
> not typical either, in that some of the telltale signs
> usually found in shaken baby cases did not exist in
> this case." *Smith* v. *Mitchell*, Case No. CV 01–4484–
> ABC (CD Cal., Mar. 22, 2004), p. 10, App. I to Pet. for
> Cert. 65.

The District Court adopted the Magistrate Judge's recommendation to deny Smith's petition, but granted a certificate of appealability, recognizing that "reasonable jurists would find the [court's] assessment of [Smith's] claims debatable." Order in No. CV 01–4484–ABC (CD Cal., Apr. 29, 2004), Doc. 36, p. 1.

After full briefing and argument, the Ninth Circuit reversed the District Court's judgment. The Court of Appeals acknowledged the limitations on its authority. "We approach this case," the court said, "with a firm awareness of the very strict limits that the [Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)] places on our collateral review of state criminal convictions." *Smith* v. *Mitchell*, 437 F. 3d 884, 888–889 (CA9 2006). Accurately describing the standards applicable under AEDPA and *Jackson* v. *Virginia*, 443 U. S. 307 (1979), and reviewing the evidence in some detail, the court concluded that "[i]n this most unusual case,. . . the [California] Court of Appeal unreasonably applied *Jackson*." 437 F. 3d, at 889.

Beyond question, the Court today reviews a case as tragic as it is extraordinary and fact intensive. By taking up the case, one may ask, what does the Court achieve other than to prolong Smith's suffering and her separation from her family. Is this Court's intervention really necessary? Our routine practice counsels no.

Error correction is "outside the mainstream of the

Court's functions." E. Gressman, K. Geller, S. Shapiro, T. Bishop, & E. Hartnett, Supreme Court Practice §5.12(c)(3), p. 351 (9th ed. 2007). As this Court's Rule 10 informs, "[a] petition for a writ of certiorari is rarely granted when the asserted error [is] . . . the misapplication of a properly stated rule of law." The Ninth Circuit correctly described the relevant legal rules under AEDPA and *Jackson* v. *Virginia*. This Court, therefore, has no law-clarifying role to play. Its summary adjudication seems to me all the more untoward for these reasons: What is now known about shaken baby syndrome (SBS) casts grave doubt on the charge leveled against Smith; and uncontradicted evidence shows that she poses no danger whatever to her family or anyone else in society.

I turn first to the medical evidence presented at trial. Dr. Carpenter, the autopsy supervisor, testified that the following symptoms are consistent with, but not required for, a diagnosis of SBS: cerebral edema, subdural hemorrhage, retinal hemorrhage, bleeding at the joints of the back of the neck, bruises on the arms, fractures of the ribs, and internal injuries to the buttocks, abdominal organs, and chest organs. Tr. 575. Few of these signs of SBS were present here. Etzel's subdural hemorrhage and subarachnoid hemorrhage were "minimal," insufficient to cause death. *Id.,* at 540–541, 557–558, 675, 693, 700, 729, 1484–1485. There was no brain swelling and no retinal hemorrhage in either eye. *Id.,* at 580, 693, 802, 1274.[1] Similarly absent were any fractures, sprains, bleeding in the joints, or displacement of joints. *Id.,* at 682. A "tiny" abrasion on the skin and a corresponding bruise under the scalp did not produce brain trauma. *Id.,* at 555, 562, 576, 712–713.

These findings led Dr. Carpenter, the autopsy supervi-

_____

[1] The State's third expert, Dr. Chadwick, who was not present at Etzel's autopsy, testified that there may have been some swelling. But he conceded that any swelling could not have caused death. Tr. 1478.

sor, and Dr. Erlich, who performed Etzel's autopsy, to rule out two commonly proffered causes of death in SBS cases: massive bleeding and massive swelling that create pressure and push the brain downward. *Id.,* at 541, 551–552, 729–730, 801. Instead, they opined, Etzel's death was caused by direct injury—shearing or tearing of the brainstem or the brain itself. *Id.,* at 694–696, 729–730, 801, 1298. The autopsy revealed no physical evidence of such injury, either grossly or microscopically. *Id.,* at 730, 763, 803–804, 1298–1299. Dr. Carpenter was unable to state which particular areas of the brain were injured, and the neuropathologist found no evidence of specific brain injury. *Id.,* at 696, 1475. No doctor located any tear. Indeed, the examining physicians did not cut open Etzel's brainstem, or submit it to neuropathology, because, in their own estimation, "[w]e wouldn't have seen anything anyway." *Id.,* at 803, 1299.[2]

Neither doctor testified to ever having performed an autopsy on an infant in which a similar conclusion was reached. Nor did either physician point to any medical literature supporting their belief that shearing or tearing of the brainstem or the brain itself caused Etzel's death. *Id.,* at 694–696, 801–802. Dr. Carpenter nevertheless maintained that when there is subdural hemorrhage without signs of external trauma to the head or skull, the injury is necessarily caused by violent shaking. *Id.,* at 576–577, 660–661. Smith's conviction thus turned on, as Dr. Erlich put it, "direct trauma which we don't see to the brainstem." *Id.,* at 801. That this gave the Ninth Circuit pause is understandable. Dr. Erlich herself conceded that "[i]t is a difficult concept to absorb." *Id.,* at 1298.

Reason to suspect the Carpenter-Erlich thesis has

---

[2] Dr. Chadwick mentioned new methods, not then standard in medical examiners' offices and not used here, which may reveal this type of brainstem damage. *Id.,* at 1448, 1481–1482.

grown in the years following Smith's 1997 trial. Doubt has increased in the medical community "over whether infants can be fatally injured through shaking alone." *State* v. *Edmunds*, 2008 WI App. 33, ¶15, 308 Wis. 2d 374, 385, 746 N. W. 2d 590, 596. See, *e.g.,* Donohoe, Evidence-Based Medicine and Shaken Baby Syndrome, Part I: Literature Review, 1966–1998, 24 Am. J. Forensic Med. & Pathology 239, 241 (2003) (By the end of 1998, it had become apparent that "there was inadequate scientific evidence to come to a firm conclusion on most aspects of causation, diagnosis, treatment, or any other matters pertaining to SBS," and that "the commonly held opinion that the finding of [subdural hemorrhage] and [retinal hemorrhage] in an infant was strong evidence of SBS was unsustainable."); Bandak, Shaken Baby Syndrome: A Biomechanics Analysis of Injury Mechanisms, 151 Forensic Sci. Int'l 71, 78 (2005) ("Head acceleration and velocity levels commonly reported for SBS generate forces that are far too great for the infant neck to withstand without injury. . . . [A]n SBS diagnosis in an infant . . . without cervical spine or brain stem injury is questionable and other causes of the intracerebral injury must be considered."); Minns, Shaken Baby Syndrome: Theoretical and Evidential Controversies, 35 J. Royal College of Physicians of Edinburgh 5, 10 (2005) ("[D]iagnosing 'shaking' as a mechanism of injury . . . is not possible, because these are unwitnessed injuries that may be incurred by a whole variety of mechanisms solely or in combination."); Uscinski, Shaken Baby Syndrome: An Odyssey, 46 Neurol. Med. Chir. (Tokyo) 57, 59 (2006) ("[T]he hypothetical mechanism of manually shaking infants in such a way as to cause intracranial injury is based on a misinterpretation of an experiment done for a different purpose, and contrary to the laws of injury biomechanics as they apply specifically to the infant anatomy."); Leestma, Case Analysis of Brain-Injured Admittedly Shaken Infants, 54 Cases,

1969–2001, 26 Am. J. Forensic Med. & Pathology 199, 211 (2005) ("[M]ost of the pathologies in allegedly shaken babies are due to impact injuries to the head and body."); Squier, Shaken Baby Syndrome: The Quest for Evidence, 50 Developmental Med. & Child Neurology 10, 13 (2008) ("[H]ead impacts onto carpeted floors and steps from heights in the 1 to 3 feet range result in far greater . . . forces and accelerations than shaking and slamming onto either a sofa or a bed.").

In light of current information, it is unlikely that the prosecution's experts would today testify as adamantly as they did in 1997. Noteworthy in this regard, prosecution witnesses Carpenter and Erlich testified that the belated diagnosis of old (*i.e.,* chronic) blood in Etzel's brain and around his optic nerves did not change their initial cause-of-death findings, because rebleeding of old subdural blood does not occur in infants. Tr. 608–609, 672–673, 721–722, 771, 776, 1269–1270, 1283. Recent scientific opinion undermines this testimony. See Miller & Miller, Over-representation of Males in Traumatic Brain Injury of Infancy and in Infants with Macrocephaly, 31 Am. J. Forensic Med. & Pathology 165, 170 (2010) ("Small, asymptomatic [subdural hematomas] from the normal trauma of the birth process can spontaneously rebleed or rebleed with minimal forces, enlarge, and then present with clinical symptoms and [subdural hematoma, retinal hemorrhages, and neurologic dysfunction] in the first year of life. . . . [This situation] mimic[s] child abuse, and we believe many such infants in the past have been mistaken-ly diagnosed as victims of child abuse, when they were likely not."). What is now known about SBS hypotheses seems to me worthy of considerable weight in the discre-tionary decision whether to take up this tragic case.

I consider next the State's meager nonmedical evidence. There was no evidence whatever that Smith abused her grandchildren in the past or acted with any malicious

intent on the night in question.  Instead, the evidence indicated that Smith was warm hearted, sensitive, and gentle.  Tr. 1086.  As earlier observed, see *supra,* at 1, the Magistrate Judge noted the absence of any motive or precipitating event that might have led Smith to shake Etzel violently.  Although shaking may quiet a crying child, Tr. 601, no evidence showed that Etzel was crying in the hours before he died, *id.,* at 444.  To the contrary: Any loud crying likely would have woken Etzel's siblings, Yondale, age 14 months, and Yolanda, age 4, asleep only feet away, even Etzel's mother, Tomeka, asleep in the neighboring room.  *Id.,* at 335, 358–361.  Yet no one's slumber was disturbed.  *Id.,* at 358–361.

   The prosecution relied on the testimony of a social worker, who asserted that Smith, after hearing that the cause of Etzel's death had been changed from Sudden Infant Death Syndrome (SIDS) to shaken baby syndrome, *id.,* at 840, and after stating that she had given Etzel "a little shake, a jostle to awaken him" when she found him unresponsive, asked "something like 'Oh, my God.  Did I do it? Did I do it? Oh, my God.'"  *Id.,* at 842, 847.[3]  Etzel's mother, Tomeka, contradicted this account.  According to Tomeka, after the social worker accused Smith of killing Etzel, Smith started crying, *id.,* at 429–430, and responded, "No, I didn't," *id.,* at 387.  Taking the social worker's version of events as true, Smith's distraught and equivocal question fairly cannot be equated to a confession of guilt.  Giving a baby "a little shake, a jostle to wake him," *ante*, at 2 (internal quotation marks omitted), after finding him unexpectedly unresponsive, surely is not an admission to shaking a child violently, causing his brainstem to tear.

————————

   [3] The social worker also testified that Etzel's mother, Tomeka, told Smith: "If it wasn't for you this wouldn't have happened."  *Id.,* at 847.  Tomeka denied making any statement to that effect.  *Id.,* at 389.

Moreover, Smith's counsel, Ubiwe Eriye,[4] represented her poorly at trial. In a case as trying as this one, competent counsel might have persuaded the jury to disbelieve the prosecution's case. A few examples from the record are illustrative. At the suppression hearing, the presiding judge was so disturbed about Eriye's preparation for trial that he remarked to the defendant, "Miss Smith, I'm scared." Tr. A52. Eriye badly misportrayed the burden of proof when he declared, both at the suppression hearing and in his opening remarks, that he would prove, beyond a shadow of a doubt, that Smith was not guilty. *Id.,* at A58– A59, 213. The two experts Eriye called presented testimony that hardly meshed.[5]

In sum, this is a notably fact-bound case in which the Court of Appeals unquestionably stated the correct rule of law. It is thus "the type of case in which we are *most* inclined to deny certiorari." *Kyles* v. *Whitley*, 514 U. S. 419, 460 (1995) (SCALIA, J., dissenting). Nevertheless, the Court is bent on rebuking the Ninth Circuit for what it conceives to be defiance of our prior remands. See *ante,* at 8. I would not ignore Smith's plight and choose her case as a fit opportunity to teach the Ninth Circuit a lesson.

But even if granting review qualified as a proper exercise of our discretionary authority, I would resist summary reversal of the Court of Appeals' decision. The fact-intensive character of the case calls for attentive review of the record, including a trial transcript that runs over 1,500 pages. Careful inspection of the record would be aided by the adversarial presentation that full briefing

——————

[4] Eriye has since resigned from the California Bar with discipline charges pending.

[5] Dr. Goldie testified that the old blood in Etzel's brain did not contribute to his death, and Etzel died of SIDS. *Id.,* at 994–995, 1403. In contrast, Dr. Siegler testified that the old blood provided the basis for his conclusion that Etzel died of an earlier brain trauma, *id.,* at 1152– 1153, 1166–1167, not SIDS, *id.,* at 1193–1194.

and argument afford. See, *e.g.,* R. Fallon, J. Manning, D. Meltzer, D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 1480 (6th ed. 2009) (posing question whether summary reversal would "smack of unfairness to the losing party unless an opportunity were afforded for the filing of briefs on the merits"); Gressman, Supreme Court Practice §6.12(c), p. 417, and n. 46 (questioning the Court's reliance on its own examination of the record in summarily reversing, without at least affording the parties, "particularly the respondent," an opportunity to brief the critical issue and identify the relevant portions of the record). Peremptory disposition, in my judgment, is all the more inappropriate given the grave consequences of upsetting the judgment below: Smith, who has already served ten years, will be returned to prison to complete a sentence of fifteen years to life. Before depriving Smith of the liberty she currently enjoys, and her family of her care, I would at least afford her a full opportunity to defend her release from a decade's incarceration.

\*    \*    \*

For the reasons stated, justice is not served by the Court's exercise of discretion to take up this tragic, fact-bound case. I would therefore deny the petition for review.